**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice, Antitrust Division<br>450 5th Street, N.W., Suite 8700<br>Washington, D.C. 20530,<br><br>    *Plaintiff*,<br><br>    v.<br><br>DANONE S.A.<br>17, Boulevard Haussmann<br>Paris, France<br>75009<br><br>and<br><br>THE WHITEWAVE FOODS COMPANY<br>1225 Seventeenth Street<br>Suite 1000<br>Denver, Colorado 80202,<br><br>    *Defendants*. | Civil Action No.: |

**COMPLAINT**

The United States of America ("United States"), acting under the direction of the Attorney General of the United States, brings this civil antitrust action for equitable relief against defendants Danone S.A. ("Danone") and The WhiteWave Foods Company ("WhiteWave"), for violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The United States alleges as follows:

### I. NATURE OF THE ACTION

1. On July 6, 2016, Danone, the leading U.S. manufacturer of organic yogurt, agreed to acquire WhiteWave, the leading U.S. manufacturer of fluid organic milk, for approximately

$12.5 billion.  Danone has participated in the raw organic milk and fluid organic milk markets for the past two decades through a strategic partnership with WhiteWave's closest competitor, CROPP Cooperative ("CROPP").  As a result, Danone's acquisition of WhiteWave effectively brings together WhiteWave and CROPP, the top purchasers of raw organic milk in the northeast United States and the producers of the three leading brands of fluid organic milk in the United States.

2.      Danone is invested in CROPP's success through two agreements, pursuant to which CROPP supplies almost all organic milk requirements for Danone's market-leading Stonyfield organic yogurt brand ("Supply Agreement") and licenses from Danone the exclusive right to produce Stonyfield-branded fluid organic milk ("License Agreement").  The two companies have cooperated with each other to bring Stonyfield products to market and to compete against WhiteWave.  WhiteWave is CROPP's closest competitor, and competes to contract with farmers for the purchase of raw organic milk in the northeast United States, and to manufacture and sell fluid organic milk to retail customers nationwide.

3.      Post merger, the entanglements between the merged entity ("Danone-WhiteWave") and CROPP would provide incentives and opportunities for the two companies to interact, strategize, coordinate marketing, and exchange confidential information.  As the only two major purchasers of raw organic milk in the northeast United States, and the two primary sellers of fluid organic milk nationwide, post-merger Danone-WhiteWave and CROPP would have the incentive to compete less aggressively to recruit and retain organic farmers and customer accounts.  This would likely result in less favorable contract terms for northeast farmers for raw organic milk, and higher prices for fluid organic milk consumers.  Given the entanglements between Danone and CROPP, the merger between Danone and WhiteWave likely

would substantially lessen competition in the purchase of raw organic milk in the northeast and the manufacture and sale of fluid organic milk in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.     DEFENDANTS

4.      Danone S.A., a *société anonyme* organized under the laws of France, is the ultimate parent company of Stonyfield Farms, Inc. ("Stonyfield"), the leading U.S. manufacturer of organic yogurt, and one of the largest consumers of raw and processed organic milk in the nation. Danone's 2015 annual sales were approximately $24.3 billion. Stonyfield is Danone's U.S. organic dairy subsidiary. It is a Delaware corporation that manufactures yogurt at a facility in Londonderry, New Hampshire.

5.      The WhiteWave Foods Company is a Delaware corporation headquartered in Denver, Colorado. WhiteWave's premium dairy division is one of the largest purchasers of raw organic milk in the northeast United States, and sells fluid organic milk, organic yogurt, and other organic dairy products nationwide through its Horizon dairy and Wallaby organic yogurt food businesses. WhiteWave's 2015 annual sales were $3.86 billion.

## III.    JURISDICTION AND VENUE

6.      The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

7.      Defendants purchase raw organic milk in the northeast United States and sell organic dairy products nationwide. They are engaged in the regular and continuous flow of interstate commerce, and their activities in organic dairy procurement and manufacturing have had a substantial effect upon interstate commerce. The Court has subject matter jurisdiction over

this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

8. Venue for Danone and WhiteWave is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(c). Defendants have consented to venue and personal jurisdiction in the District of Columbia.

## IV.   BACKGROUND

### A. Industry Overview

9. Milk collected from a cow that has not been pasteurized and processed is called raw milk. Conventional raw milk comes from non-organic cows. Raw organic milk is milk collected from organic cows on organic farms that must meet rigorous USDA regulations governing grazing practices, hauling, handling, and processing.

10. Individual farmers typically sell their raw organic milk either in affiliation with a cooperative, which negotiates a sales price for its farmers, or through a contract, at a specified price. Farmers choose to affiliate with purchasers on the basis of service, price, and other financial incentives. Purchasers strive to form networks of farmers that meet their needs for raw organic milk and that permit efficient hauling routes. Raw organic milk purchasers compete to attract farmers to their networks.

11. Purchasers arrange for raw organic milk to be picked up from farms and transported to milk processing plants. Raw organic milk will spoil if not processed within 72 hours of collection from a cow. At the processing plant, raw organic milk is separated into fat and skim milk, pasteurized to kill bacteria, and homogenized to reduce the size of the remaining milk fat particles. The final result of this process is fluid organic milk. Most raw organic milk becomes fluid organic milk, and most fluid organic milk is packaged for retail sale as branded or

private-label products that can be shipped to retail customers nationally.  Some fluid organic milk is transported by bulk tanker to a manufacturer for conversion into another product, such as organic yogurt.

12. Fluid organic milk is packaged and sold directly to consumers in a variety of retail outlets.  Most retailers prefer to carry at least one brand of packaged fluid organic milk in addition to their own private-label fluid organic milk.  By monitoring retail shelves, fluid organic milk competitors can track which rival brands are carried by particular retail customers.

### B. Pre-Acquisition Relationships Between WhiteWave, Danone, and CROPP

#### 1. Danone/CROPP Agreements

13. For more than twenty years, Danone's Stonyfield subsidiary has cultivated a strategic partnership with CROPP.  Stonyfield, the leading manufacturer of organic yogurt in the United States, relies on CROPP for the supply of almost all of its organic milk requirements.  CROPP, in turn, relies on the revenue stream from Stonyfield's organic milk purchases to retain and compensate its farmer members, as Stonyfield has been CROPP's largest customer for the same period of time.  Presently, CROPP supplies Danone with at least 90 percent of Stonyfield's requirements for raw organic milk, fluid organic milk, and milk equivalents (*e.g.*, cream, condensed, or powdered organic milk) in the United States.

14. This longstanding Supply Agreement is critical to the viability of each of Danone and CROPP's businesses, and this dependence over the years has forged a strong relationship.  This relationship includes the sharing of competitively sensitive information regarding, for example, costs, sales, products, and customers.

15. Danone's strategic partnership with CROPP deepened in 2009, when it granted CROPP an exclusive license allowing CROPP to produce and sell Stonyfield branded fluid

organic milk, in exchange for a royalty payment. This License Agreement has allowed CROPP to expand its sales in the northeast, and to add the well-known Stonyfield trademark to a portfolio that already included the cooperative's own Organic Valley fluid organic milk brand.

16. As a result of the License Agreement, Danone and CROPP share the Stonyfield brand, which competes with WhiteWave's market-leading Horizon brand. The Stonyfield brand-sharing allowed under the License Agreement necessitates frequent meetings between Danone and CROPP to discuss marketing and to collaborate on promotions, which have required the sharing of confidential and competitively sensitive business information. CROPP's Stonyfield fluid organic milk benefits from Danone's investments in the Stonyfield organic yogurt brand. Danone, in turn, receives a royalty payment while also benefitting from the perception of a broader Stonyfield portfolio, without requiring an investment in the production of Stonyfield fluid organic milk.

### 2. WhiteWave and CROPP

17. WhiteWave and CROPP are the first- and second-largest purchasers of raw organic milk in the northeast United States, respectively. To supply its needs, WhiteWave contracts with approximately 600 farms in the northeast and 800 farms in total nationwide. To supply Danone and its own needs, CROPP contracts with 500 northeast farms and 1,500 farms in total nationwide.

18. WhiteWave and CROPP compete to offer farmers the best price for their raw organic milk, the highest quality service, and the most attractive incentives to convert from conventional to organic dairy farming. Farmers, in turn, request concessions from WhiteWave based on CROPP's offers, and vice versa.

19. WhiteWave's Horizon brand is the only nationwide competitor to CROPP's Organic Valley brand and Danone-CROPP's Stonyfield brand for the sale of fluid organic milk to retailers.

## V.   RELEVANT MARKETS

### A. The Purchase of Raw Organic Milk in the Northeast

20. The purchase of raw organic milk is a relevant product market and line of commerce under Section 7 of the Clayton Act. Although raw organic milk could be sold by farmers as conventional milk, the milk would typically be sold at a loss because conventional milk prices do not cover the organic farmer's production costs. Therefore, farmers who sell raw organic milk cannot economically switch to supplying purchasers of conventional milk.

21. Transporting raw organic milk produced by northeast farmers beyond the northeast United States is expensive, risks spoilage of the raw organic milk, and stretches the outer bounds of regulatory requirements that raw organic milk be processed within 72 hours of its collection. Most raw organic milk is processed within several hundred miles of the location where it is produced. Indeed, the relevant geographic market for the purchase of raw organic milk is referred to in the dairy industry as "the northeast," because the farmers who sell raw organic milk to WhiteWave and to Danone (through CROPP) are located in the northeast United States. For these purposes, the northeast includes Connecticut, Delaware, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Maryland. A hypothetical monopsonist purchaser of raw organic milk from farmers in the northeast would profitably impose a reduction in the price of raw organic milk paid to farmers by at least a small but significant and non-transitory amount (*e.g.*, five percent).

### B. The Sale of Fluid Organic Milk in the United States

22. Fluid organic milk is a relevant product market and line of commerce under Section 7 of the Clayton Act. Consumers do not significantly switch away from fluid organic milk, for example to conventional milk, when the price increases by a significant non-transitory amount. The relevant geographic market for the sale of fluid organic milk is no larger than the United States. Fluid organic milk is pasteurized using methods that allow for a longer shelf life than most conventional milk, allowing it to be shipped long distances when necessary. A hypothetical monopolist seller of fluid organic milk in the United States would profitably impose at least a small but significant and non-transitory price increase.

## VI. ANTICOMPETITIVE EFFECTS

23. Given the strategic partnership between Danone and CROPP, this transaction gives Danone the incentive and ability to limit the existing competition between WhiteWave and CROPP for both farmer contracts and retail customer accounts. Danone and CROPP are linked together by the Supply Agreement, the License Agreement, and years of operational cooperation. They are dependent on each other for supply and revenue, respectively, and they share the Stonyfield brand. Their aligned interests and mutual dependence make it unlikely, therefore, that CROPP would continue to compete fiercely with Danone-WhiteWave post merger.

24. Concentrated markets, coupled with the entanglements created by these agreements, increase the likelihood of anticompetitive effects. WhiteWave and CROPP collectively purchase approximately 70 percent of the available northeast raw organic milk supply. The small, regional dairies that make up the remaining 30 percent cannot expand their

farmer networks (thereby increasing their own purchases) without access to the fluid organic milk customers currently supplied by WhiteWave and CROPP.

25. In retail fluid organic milk sales, Horizon, Organic Valley, and Stonyfield account for 41 percent, 10 percent, and 5 percent of shares, respectively. For branded fluid organic milk, specifically, Horizon, Organic Valley, and Stonyfield represent 67 percent, 16 percent, and 8 percent of national retail sales, respectively. The merger links these three firms, which together control almost 56 percent of all fluid organic milk sales, and 91 percent of all branded fluid organic milk sales.

26. CROPP and WhiteWave generally can identify when and where they are competing against each other for farmers or retail customers. Affiliations between farmers and purchasers are well known because there are relatively few purchasers and one can readily observe which farmers are in a given purchaser's network. Relationships between fluid organic milk sellers and their retail customers are also well known because it is easy to observe which brands are available in each retail store. These highly transparent supply and customer relationships allow market participants to identify their particular rival in most competitive interactions. Given the transparency of these markets, the merger would curtail competition between the Danone-CROPP partnership and WhiteWave.

27. The merger reduces the incentives for the combined Danone-WhiteWave to compete aggressively against CROPP, and the supply and license relationships linking the merged entity to CROPP will provide opportunities for WhiteWave and CROPP to interact, strategize, coordinate marketing, and exchange confidential and competitively sensitive information.

28.     The only way for CROPP to continue to compete aggressively against WhiteWave post merger is by severing its Supply Agreement and License Agreement with Danone.  This would have significant costs and risks.  In light of these costs and risks, and as CROPP's ability to compete with WhiteWave is undermined by the merger, it will likely find it more profitable to remain in the partnership than to abandon it.  The result is a likely lessening of competition in the purchase of raw organic milk from farmers and in the sale of fluid organic milk to retailers.

### VII.   ABSENCE OF COUNTERVAILING FACTORS

29.     New entry and expansion by existing competitors are unlikely to prevent or remedy the acquisition's likely anticompetitive effects.  Barriers to entry and expansion in the raw organic and fluid organic milk markets include:  (1) the substantial time and expense required to build a brand reputation sufficient to provide an outlet for raw organic milk purchases and fluid organic milk sales; (2) substantial sunk costs to be able to sell fluid organic milk in wholesale and retail outlets; (3) the expense of capital investments necessary to manufacture fluid organic milk; and (4) the investments necessary to develop raw organic milk hauling, fluid organic milk distributor relationships, and fluid organic milk delivery routes.

### VIII.   VIOLATIONS ALLEGED

30.     The acquisition of WhiteWave by Danone likely would substantially lessen competition in each of the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

31.     Unless enjoined, the transaction will have the following anticompetitive effects, among others:

      a.      Competition generally in the relevant markets would be substantially reduced; and

      b.      Prices and commercial terms for the relevant products would be less favorable.

### IX.   REQUEST FOR RELIEF

32.    The United States requests that this Court:

      a.      adjudge and decree Danone's proposed acquisition of WhiteWave to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

      b.      preliminarily and permanently enjoin and restrain defendants and all persons acting on their behalf from consummating Danone's proposed acquisition of WhiteWave or from entering into or carrying out any contract, agreement, plan, or understanding, the effect of which would be to combine Danone and WhiteWave;

      c.      award the United States its costs of this action; and

      d.      award the United States such other relief as the Court deems just and proper.

Dated: April 3, 2017

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

_____
BRENT SNYDER
Acting Assistant Attorney General
Antitrust Division

_____
PATRICIA A. BRINK
Director of Civil Enforcement
Antitrust Division

_____
MARIBETH PETRIZZI (D.C. Bar #435204)
Chief, Litigation II Section
Antitrust Division

_____
STEPHANIE A. FLEMING
Assistant Chief, Litigation II Section
Antitrust Division

_____
SUZANNE MORRIS* (D.C. Bar #450208)
REBECCA VALENTINE (D.C. Bar #989607)
JEREMY CLINE (D.C. Bar #1011073)
United States Department of Justice
Antitrust Division Litigation II Section
450 Fifth Street N.W., Suite 8700
Washington, D.C. 20530
Telephone: (202) 307-1188
Facsimile: (202) 514-9033
suzanne.morris@usdoj.gov

*LEAD ATTORNEY TO BE NOTICED