UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANONE S.A.<br><br>and<br><br>THE WHITEWAVE FOODS COMPANY,<br><br>Defendants. | CASE NO.: 17cv0592 (KBJ)<br><br>JUDGE: Ketanji Brown Jackson |

**HOLD SEPARATE STIPULATION AND ORDER**

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

## I. DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A. “Acquirer” means the entity to whom defendants divest the Divestiture Assets.

B. “Danone” means defendant Danone S.A., a *société anonyme* organized under the laws of France, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C. “WhiteWave” means defendant The WhiteWave Foods Company, a Delaware corporation with its headquarters in Denver, Colorado, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

D. "Stonyfield" means Stonyfield Farm, Inc., a Delaware corporation with its headquarters in Londonderry, New Hampshire, its successors and assigns, and its subsidiaries and divisions, and their respective directors, officers, managers, agents and employees, but does not include Stonyfield's minority interest in Stonyfield Europe Ltd.

E. "Oikos Brands" means all Oikos trademarks, service marks, trade names, trade dress, logos and domain names, corporate names, and goodwill.

F. "Oikos Schreiber" means Danone's conventional Greek yogurt products manufactured under the Oikos trademark at the Schreiber Foods, Inc. facility in Shippensburg, Pennsylvania as of the date of the Complaint filed in this matter.

G. "Brown Cow Schreiber" means Stonyfield's conventional Greek yogurt products manufactured under the Brown Cow trademark at the Schreiber Foods, Inc. facility in Shippensburg, Pennsylvania as of the date of the Complaint filed in this matter.

H. "Brown Cow Greek Formula" means the intellectual property relating to the formula, recipe, and specifications used as of the date of the Complaint filed in this matter for the production of the Oikos Schreiber and Brown Cow Schreiber conventional Greek yogurt products.

I. "Minster Facility" means Danone's manufacturing facility in Minster, Ohio.

J. "Divestiture Assets" means Stonyfield, including:

1. Stonyfield's headquarters, facility, and warehouse located at 10 Burton Drive, Londonderry, New Hampshire 03053;

2. The following tangible assets that comprise the Stonyfield business, including but not limited to:

(a) all manufacturing equipment, tooling and fixed assets, personal property, warehouses (leased and owned), trucks and other vehicles, inventory, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with Stonyfield; and

(b) all licenses, permits and authorizations issued by any governmental organization relating to Stonyfield; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings relating to Stonyfield, including supply agreements; all customer lists, routes, contracts, accounts, and credit records relating to Stonyfield; all repair and performance records relating to Stonyfield; and all other records relating to Stonyfield. Notwithstanding the above, for any tangible asset in this subsection that is shared between Danone and Stonyfield, Danone and Stonyfield shall each be entitled to retain that portion of the asset that relates to their respective business. To the extent Danone's consent or waiver of exclusive rights is required for Stonyfield to renegotiate or modify the terms of any shared asset in this subsection, Danone shall take all steps necessary to remove any impediments that would prevent Stonyfield from renegotiating or modifying the terms of the shared asset.

3. The following intangible assets:

(a) all intangible assets owned, licensed, controlled, or used primarily by Stonyfield (except the Oikos Brands), including, but not limited to, all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, formulas, recipes, proprietary cultures, technical information, computer software and related documentation, know-how, trade secrets, drawings, artwork, blueprints, designs, design protocols, specifications for materials, specifications for production and packaging, specifications for parts and devices, safety procedures for the handling of materials and

substances, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to Stonyfield, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments;

(b) a non-exclusive, perpetual, royalty-free license, transferable among Stonyfield and its subsidiaries, to use the Brown Cow Greek Formula to produce all Stonyfield products that use the Brown Cow Greek Formula as of the date of the Complaint; provided that if prior to the divestiture ordered by this Final Judgment, Stonyfield ceases the use of the Brown Cow Greek Formula, this license will not be included as a Divestiture Asset;

(c) a non-exclusive, perpetual, royalty-free license, transferable among Stonyfield and its subsidiaries to use any intangible assets (except the Brown Cow Greek Formula and Activia trademarks) that are not included in paragraph I(J)(3)(a) above, and were used in connection with the development, production, manufacture, or sale of any Stonyfield product. To the extent Danone's consent or waiver of exclusive rights is required for Stonyfield to access or utilize a license, Danone will take all steps necessary to provide Stonyfield with the license and remove any impediments that would prevent Stonyfield from utilizing the license. Any improvements or modifications to these intangible assets developed by the Acquirer of Stonyfield shall be owned solely by that Acquirer; and

(d) a non-exclusive, perpetual, royalty-free license, transferable among Stonyfield and its subsidiaries, to use Danone's intangible assets related to the design and manufacture of the 3.1 oz plastic bottles used to package Stonyfield products at the Minster Facility as of the date of the Complaint.

## II. OBJECTIVES

The proposed Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Divestiture Assets for the purpose of establishing a viable competitor in the production and sale of Stonyfield products to remedy the effects the United States alleges would otherwise result from Danone's acquisition of WhiteWave. This Hold Separate Stipulation and Order ensures, prior to such divestiture, that the Divestiture Assets remain an independent, economically viable, and ongoing business concern that will remain independent and uninfluenced by defendants, and that competition is maintained during the pendency of the ordered divestiture.

## III. JURISDICTION AND VENUE

The Court has jurisdiction over the subject matter of this action and over each of the parties hereto, and venue of this action is proper in the United States District Court for the District of Columbia.

## IV. COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A. The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. § 16, and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B. Defendants agree to arrange, at their expense, publication as quickly as possible of the newspaper notice required by the APPA, which shall be drafted by the United States in its sole discretion. The publication shall be arranged no later than three (3) business days after

defendants' receipt from the United States of the text of the notice and the identity of the newspaper within which the publication shall be made. Defendants shall promptly send to the United States (1) confirmation that publication of the newspaper notice has been arranged, and (2) the certification of the publication prepared by the newspaper within which the notice was published.

C. Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Hold Separate Stipulation and Order by the parties, comply with all the terms and provisions of the proposed Final Judgment. The United States shall have the full rights and enforcement powers in the proposed Final Judgment, including Section X as though the same were in full force and effect as the final order of the Court.

D. Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation and Order.

E. This Hold Separate Stipulation and Order shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

F. In the event (1) the United States has withdrawn its consent, as provided in Paragraph IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Hold Separate Stipulation and Order, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Hold Separate Stipulation and

Order, and the making of this Hold Separate Stipulation and Order shall be without prejudice to any party in this or any other proceeding.

G. Defendants represent that the divestiture ordered in the proposed Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V. HOLD SEPARATE PROVISIONS

Until the divestiture required by the proposed Final Judgment has been accomplished:

A. Defendants shall preserve, maintain, and continue to operate the Divestiture Assets as an independent, ongoing, economically viable competitive business, with management, sales, and operations of such assets held entirely separate, distinct and apart from those of defendants' other operations. Defendants shall not coordinate their development, production, marketing, or terms of sale of any products with those produced by or sold under any of the Divestiture Assets. Within twenty (20) days after the entry of the Hold Separate Stipulation and Order, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

B. Defendants shall take all steps necessary to ensure that (1) the Divestiture Assets will be maintained and operated as an independent, ongoing, economically viable, and active competitor in the markets for all products produced or sold by Stonyfield as of the date of the Complaint filed in this matter; (2) management of the Divestiture Assets will not be influenced by defendants; and (3) the books, records, competitively sensitive sales, marketing, pricing information, and decision-making concerning the development, production, distribution, or sales of products by or under the Divestiture Assets will be kept separate and apart from defendants' other operations.

C. Defendants shall use all reasonable efforts to maintain and increase the sales and revenues of the products produced by or sold under the Divestiture Assets. Defendants shall maintain at 2016 or previously approved levels for 2017, whichever are higher, all promotional, advertising, sales, technical assistance, marketing, and merchandising support for the Divestiture Assets.

D. Defendants shall provide sufficient working capital and lines and sources of credit to continue to maintain the Divestiture Assets as an economically viable and competitive, ongoing business, consistent with the requirements of Paragraphs V(A) and (B).

E. Defendants shall take all steps necessary to ensure that the Divestiture Assets are fully maintained in operable condition at no less than their current capacity and sales, and shall maintain and adhere to normal repair and maintenance schedules for the Divestiture Assets.

F. Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge, or otherwise dispose of any of the Divestiture Assets.

G. Defendants shall maintain, in accordance with sound accounting principles, separate, accurate, and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of the Divestiture Assets.

H. Defendants shall take no action that would jeopardize, delay, or impede the sale of the Divestiture Assets.

I. Defendants' employees with primary responsibility for the design, development, manufacturing, production, distribution, marketing, or sale of products produced or sold by Stonyfield shall not be transferred or reassigned to other areas within

the company, except for transfer bids initiated by employees pursuant to defendants' regular, established job posting policy. Defendants shall provide the United States with ten (10) calendar days notice of any such transfer.

J. Defendants shall appoint a person or persons to oversee the Divestiture Assets and who will be responsible for defendants' compliance with this section. This person shall have complete managerial responsibility for the Divestiture Assets, subject to the provisions of the proposed Final Judgment. In the event such person is unable to perform his duties, defendants shall appoint, subject to the approval of the United States, a replacement within ten (10) working days. Should defendants fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

K. Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the proposed Final Judgment to complete the divestiture pursuant to the proposed Final Judgment to an Acquirer acceptable to the United States.

## VI. DURATION OF HOLD SEPARATE OBLIGATIONS

Defendants' obligations under Section V of this Hold Separate Stipulation and Order shall remain in effect until (1) consummation of the divestiture required by the proposed Final Judgment or (2) further order of the Court. If the United States voluntarily dismisses the

Complaint in this matter, defendants are released from all further obligations under this Hold Separate Stipulation and Order.

DATED: April 3, 2017

Respectfully submitted,

**FOR PLAINTIFF**
**UNITED STATES OF AMERICA:**

SUZANNE MORRIS (DC Bar #450208)
United States Department of Justice
Antitrust Division, Litigation II Section
450 Fifth Street N.W., Suite 8700
Washington, D.C. 20530
Telephone: (202) 307-1188
Facsimile: (202) 514-9033
suzanne.morris@usdoj.gov

**FOR DEFENDANT**
**DANONE S.A.:**

Ilene Knable Gotts
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street,
New York, NY 10019
Telephone: (212) 403-1247
ikgotts@wlrk.com

**FOR DEFENDANT**
**THE WHITEWAVE FOODS COMPANY:**

Paul T. Denis
Dechert LLP
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 261-3430
paul.denis@dechert.com

IT IS SO ORDERED by the Court, this 5th day of April, 2017.

*Ketanji Brown Jackson*
Ketanji Brown Jackson
United States District Judge

# EXHIBIT A:

# PROPOSED FINAL JUDGMENT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANONE S.A.<br><br>and<br><br>THE WHITEWAVE FOODS COMPANY,<br><br>Defendants. | CASE NO.:<br><br>JUDGE: |

**PROPOSED FINAL JUDGMENT**

WHEREAS, Plaintiff United States of America, filed its Complaint on April 3, 2017, the United States and defendants, Danone S.A. ("Danone") and The WhiteWave Foods Company ("WhiteWave"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendants have represented to the United States that the divestiture required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended.

## II. DEFINITIONS

As used in this Final Judgment:

A. "Acquirer" means the entity to whom defendants divest the Divestiture Assets.

B. "Danone" means defendant Danone S.A., a *société anonyme* organized under the laws of France, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C. "WhiteWave" means defendant The WhiteWave Foods Company, a Delaware corporation with its headquarters in Denver, Colorado, its successors and assigns, and its

subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

D. “Stonyfield” means Stonyfield Farm, Inc., a Delaware corporation with its headquarters in Londonderry, New Hampshire, its successors and assigns, and its subsidiaries and divisions, and their respective directors, officers, managers, agents and employees, but does not include Stonyfield’s minority interest in Stonyfield Europe Ltd.

E. “Oikos Brands” means all Oikos trademarks, service marks, trade names, trade dress, logos and domain names, corporate names, and goodwill.

F. “Oikos Schreiber” means Danone’s conventional Greek yogurt products manufactured under the Oikos trademark at the Schreiber Foods, Inc. facility in Shippensburg, Pennsylvania as of the date of the Complaint filed in this matter.

G. “Brown Cow Schreiber” means Stonyfield’s conventional Greek yogurt products manufactured under the Brown Cow trademark at the Schreiber Foods, Inc. facility in Shippensburg, Pennsylvania as of the date of the Complaint filed in this matter.

H. “Brown Cow Greek Formula” means the intellectual property relating to the formula, recipe, and specifications used as of the date of the Complaint filed in this matter for the production of the Oikos Schreiber and Brown Cow Schreiber conventional Greek yogurt products.

I. “Centralized Business Services” means Danone’s internal provider of back office functions.

J. “DanTrade” means DanTrade B.V., Danone’s global purchasing entity.

K. “Fort Worth Facility” means Danone’s manufacturing facility in Fort Worth, Texas.

L. “Minster Facility” means Danone’s manufacturing facility in Minster, Ohio.

M. “Divestiture Assets” means Stonyfield, including:

1. Stonyfield’s headquarters, facility, and warehouse located at 10 Burton Drive, Londonderry, New Hampshire 03053;

2. The following tangible assets that comprise the Stonyfield business including but not limited to:

(a) all manufacturing equipment, tooling and fixed assets, personal property, warehouses (leased and owned), trucks and other vehicles, inventory, office furniture, materials, supplies, and other tangible property and all assets used exclusively in connection with Stonyfield; and

(b) all licenses, permits and authorizations issued by any governmental organization relating to Stonyfield; all contracts, teaming arrangements, agreements, leases, commitments, certifications, and understandings, relating to Stonyfield, including supply agreements; all customer lists, routes, contracts, accounts, and credit records relating to Stonyfield; all repair and performance records relating to Stonyfield; and all other records relating to Stonyfield. Notwithstanding the above, for any tangible asset in this subsection that is shared between Danone and Stonyfield, Danone and Stonyfield shall each be entitled to retain that portion of the asset that relates to their respective business. To the extent Danone’s consent or waiver of exclusive rights is required for Stonyfield to renegotiate or modify the terms of any

shared asset in this subsection, Danone shall take all steps necessary to remove any impediments that would prevent Stonyfield from renegotiating or modifying the terms of the shared asset.

3. The following intangible assets:

(a) all intangible assets owned, licensed, controlled, or used primarily by Stonyfield (except the Oikos Brands), including, but not limited to, all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, formulas, recipes, proprietary cultures, technical information, computer software and related documentation, know-how, trade secrets, drawings, artwork, blueprints, designs, design protocols, specifications for materials, specifications for production and packaging, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to Stonyfield, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments;

(b) a non-exclusive, perpetual, royalty-free license, transferable among Stonyfield and its subsidiaries, to use the Brown Cow Greek Formula to produce all Stonyfield products that use the Brown Cow Greek Formula as of the date of the Complaint; provided that if prior to the divestiture ordered by this Final Judgment, Stonyfield ceases the use of the Brown Cow Greek Formula, this license will not be included as a Divestiture Asset;

(c) a non-exclusive, perpetual, royalty-free license, transferable among Stonyfield and its subsidiaries, to use any intangible assets (except the Brown Cow Greek

Formula and Activia trademarks) that are not included in paragraph II(M)(3)(a) above, and were used in connection with the development, production, manufacture, or sale of any Stonyfield product. To the extent Danone's consent or waiver of exclusive rights is required for Stonyfield to access or utilize a license, Danone will take all steps necessary to provide Stonyfield with the license and remove any impediments that would prevent Stonyfield from utilizing the license. Any improvements or modifications to these intangible assets developed by the Acquirer of Stonyfield shall be owned solely by that Acquirer; and

(d) a non-exclusive, perpetual, royalty-free license, transferable among Stonyfield and its subsidiaries, to use Danone's intangible assets related to the design and manufacture of the 3.1 oz plastic bottles used to package Stonyfield products at the Minster Facility as of the date of the Complaint.

N. "Competitively Sensitive Information" means information that is not public and could be used by a competitor or supplier to make development, production, pricing, or marketing decisions including, but not limited to, information relating to costs, capacity, distribution, marketing, supply, market territories, customer relationships, the terms of dealing with any particular customer (including the identity of individual customers and the quantity sold to any particular customer), and current and future prices, including discounts, slotting allowances, bids, or price lists. "Competitively Sensitive Information" does not include information that must be disclosed in the ordinary course of business in order to implement a transition services or co-packing arrangement.

## III. APPLICABILITY

A. This Final Judgment applies to Danone and WhiteWave, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B. If, prior to complying with Sections IV and V of this Final Judgment, defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the Acquirer of the assets divested pursuant to this Final Judgment.

## IV. DIVESTITURE

A. Defendants are ordered and directed, within ninety (90) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

B. In accomplishing the divestiture ordered by this Final Judgment, defendants promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Defendants shall inform any person making an inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide

that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privileges or work-product doctrine. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C. Defendants shall provide the Acquirer and the United States information relating to the personnel involved in the development, production, marketing and sale of any product produced or sold by Stonyfield to enable the Acquirer to make offers of employment. Defendants will not interfere with any negotiations by the Acquirer to employ any defendant employee whose primary responsibility is the development, production, marketing and sale of any product produced or sold by Stonyfield.

D. Defendants shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to Stonyfield personnel and to make inspections of the physical facilities included in the Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E. Defendants shall warrant to the Acquirer that each asset will be operational on the date of sale.

F. Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divestiture Assets.

G. At the option of the Acquirer, Danone's Centralized BusinessServices division will provide back office and information technology services and support for Stonyfield for a period of up to one (1) year. The United States, in its sole discretion, may approve one or more extensions of this agreement for a total of up to an additional twelve (12) months. If the Acquirer seeks an extension of the term of this transition services agreement, it shall so notify the United States in writing at least three (3) months prior to the date the transition services contract expires. If the United States approves such an extension, it shall so notify the Acquirer in writing at least two (2) months prior to the date the transition services contract expires. The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to the market value of the expertise of the personnel providing any needed assistance. The Danone employee(s) tasked with providing these transitional services may not share Stonyfield's Competitively Sensitive Information with any other Danone or WhiteWave employee.

H. At the option of the Acquirer, Danone shall enter into one or more transition services agreements with the Acquirer for raw material purchases through DanTrade at Danone's internal transfer pricing rate; services relating to the operation of Stonyfield's facilities; and quality control and design services for production and regulatory compliance; to meet all or part of the Acquirer's needs for a period of up to six (6) months. The United States, in its sole discretion, may approve one or more extensions of this agreement for a total of up to an additional twelve (12) months. The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to the market value of the expertise of the personnel providing any needed assistance.

I. At the option of the Acquirer, Danone shall enter into one or more co-packing contracts with the Acquirer for a period of up to one (1) year for the continued production of Stonyfield products produced at the Fort Worth Facility and/or the Minster Facility as of the date of the Complaint. Danone will produce up to 100 percent of the average 2016 weekly volume of these Stonyfield products for the Acquirer each week upon receipt of seven (7) days' notice. The Acquirer may increase the weekly volume by 20 percent by providing Danone notice no later than three (3) days prior to production. The Acquirer may increase the weekly production volume by 100 percent with four (4) weeks' notice. The terms and conditions of any contractual arrangement to satisfy this provision must be reasonably related to market conditions for co-packing yogurt products. The United States, in its sole discretion, may approve one or more extensions of these agreements for a total of up to an additional six (6) months. If the Acquirer seeks an extension of the term of these co-packing agreements, it shall so notify the United States in writing at least three (3) months prior to the date the co-packing agreement(s) expires. If the United States approves such an extension, it shall so notify the Acquirer in writing at least two (2) months prior to the date the co-packing agreement(s) expires. Danone employees at the Fort Worth and Minster Facilities may not share Stonyfield's Competitively Sensitive Information with other Danone or WhiteWave employees.

J. Defendants shall warrant to the Acquirer that there are no material defects in the environmental, zoning or other permits pertaining to the operation of each asset, and that following the sale of the Divestiture Assets, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

K. Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by Divestiture Trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer as part of a viable, ongoing business in the production and sale of Stonyfield products. Specifically, the United States must be satisfied, in its sole discretion, that the Divestiture Assets can and will remain viable, and that the divestiture will remedy the competitive harm alleged in the Complaint. The divestiture, whether pursuant to Section IV or Section V of this Final Judgment,

1. shall be made to an Acquirer that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the markets for products produced or sold by Stonyfield; and

2. shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer and defendants give defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V. APPOINTMENT OF DIVESTITURE TRUSTEE

A. If defendants have not divested the Divestiture Assets within the time period specified in Section IV(A), defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a Divestiture Trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B. After the appointment of a Divestiture Trustee becomes effective, only the Divestiture Trustee shall have the right to sell the Divestiture Assets. The Divestiture Trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the Divestiture Trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section V(D) of this Final Judgment, the Divestiture Trustee may hire at the cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the Divestiture Trustee, reasonably necessary in the Divestiture Trustee's judgment to assist in the divestiture. Any such investment bankers, attorneys, or other agents shall serve on such terms and conditions as the United States approves including confidentiality requirements and conflict of interest certifications.

C. Defendants shall not object to a sale by the Divestiture Trustee on any ground other than the Divestiture Trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the Divestiture Trustee within ten (10) calendar days after the Divestiture Trustee has provided the notice required under Section VI.

D. The Divestiture Trustee shall serve at the cost and expense of defendants pursuant to a written agreement, on such terms and conditions as the United States approves including confidentiality requirements and conflict of interest certifications. The Divestiture Trustee shall account for all monies derived from the sale of the assets sold by the Divestiture Trustee and all costs and expenses so incurred. After approval by the Court of the Divestiture Trustee's accounting, including fees for its services yet unpaid and those of any professionals and agents

retained by the Divestiture Trustee, all remaining money shall be paid to defendants and the trust shall then be terminated. The compensation of the Divestiture Trustee and any professionals and agents retained by the Divestiture Trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the Divestiture Trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount. If the Divestiture Trustee and defendants are unable to reach agreement on the Divestiture Trustee's or any agents' or consultants' compensation or other terms and conditions of engagement within fourteen (14) calendar days of appointment of the Divestiture Trustee, the United States may, in its sole discretion, take appropriate action, including making a recommendation to the Court. The Divestiture Trustee shall, within three (3) business days of hiring any other professionals or agents, provide written notice of such hiring and the rate of compensation to defendants and the United States.

E. Defendants shall use their best efforts to assist the Divestiture Trustee in accomplishing the required divestiture. The Divestiture Trustee and any consultants, accountants, attorneys, and other agents retained by the Divestiture Trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and defendants shall develop financial and other information relevant to such business as the Divestiture Trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information or any applicable privileges. Defendants shall take no action to interfere with or to impede the Divestiture Trustee's accomplishment of the divestiture.

F. After its appointment, the Divestiture Trustee shall file monthly reports with the United States and, as appropriate, the Court setting forth the Divestiture Trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The Divestiture Trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G. If the Divestiture Trustee has not accomplished the divestiture ordered under this Final Judgment within six months after its appointment, the Divestiture Trustee shall promptly file with the Court a report setting forth (1) the Divestiture Trustee's efforts to accomplish the required divestiture, (2) the reasons, in the Divestiture Trustee's judgment, why the required divestiture has not been accomplished, and (3) the Divestiture Trustee's recommendations. To the extent such report contains information that the Divestiture Trustee deems confidential, such report shall not be filed in the public docket of the Court. The Divestiture Trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the Divestiture Trustee's appointment by a period requested by the United States.

H. If the United States determines that the Divestiture Trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, it may recommend the Court appoint a substitute Divestiture Trustee.

## VI. NOTICE OF PROPOSED DIVESTITURE

A. Within two (2) business days following execution of a definitive divestiture agreement, defendants or the Divestiture Trustee, whichever is then responsible for effecting the divestiture required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment. If the Divestiture Trustee is responsible, it shall similarly notify defendants. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B. Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendants, the proposed Acquirer, any other third party, or the Divestiture Trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirer. Defendants and the Divestiture Trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Acquirer, any third party, and the Divestiture Trustee, whichever is later, the United States shall provide written notice to defendants and the Divestiture Trustee,

if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. HOLD SEPARATE

Until the divestiture required by this Final Judgment has been accomplished, defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. AFFIDAVITS

A. Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or V, defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into

negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B. Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C. Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one (1) year after such divestiture has been completed.

## X. APPOINTMENT OF MONITORING TRUSTEE

A. Upon application of the United States, the Court shall appoint a Monitoring Trustee selected by the United States and approved by the Court.

B. The Monitoring Trustee shall have the power and authority to monitor defendants' compliance with the terms of this Final Judgment and the Hold Separate Stipulation

and Order entered by this Court, and shall have such other powers as this Court deems appropriate. The Monitoring Trustee shall be required to investigate and report on the Defendants' compliance with this Final Judgment and the Hold Separate Stipulation and Order and the defendants' progress toward effectuating the purposes of this Final Judgment, including but not limited to the terms and implementation of the transition services and co-packing agreements with Danone contemplated by Paragraphs IV(G), (H), and (I).

C. Subject to Paragraph X(E) of this Final Judgment, the Monitoring Trustee may hire at the cost and expense of defendants any consultants, accountants, attorneys, or other agents, who shall be solely accountable to the Monitoring Trustee, reasonably necessary in the Monitoring Trustee's judgment. Any such consultants, accountants, attorneys, or other agents shall serve on such terms and conditions as the United States approves including confidentiality requirements and conflict of interest certifications.

D. Defendants shall not object to actions taken by the Monitoring Trustee in fulfillment of the Monitoring Trustee's responsibilities under any Order of this Court on any ground other than the Monitoring Trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the United States and the Monitoring Trustee within ten (10) calendar days after the action taken by the Monitoring Trustee giving rise to the defendants' objection.

E. The Monitoring Trustee shall serve at the cost and expense of defendants pursuant to a written agreement with defendants and on such terms and conditions as the United States approves including confidentiality requirements and conflict of interest certifications. The compensation of the Monitoring Trustee and any consultants, accountants, attorneys, and other

agents retained by the Monitoring Trustee shall be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. If the Monitoring Trustee and defendants are unable to reach agreement on the Monitoring Trustee's or any agents' or consultants' compensation or other terms and conditions of engagement within fourteen (14) calendar days of appointment of the Monitoring Trustee, the United States may, in its sole discretion, take appropriate action, including making a recommendation to the Court. The Monitoring Trustee shall, within three (3) business days of hiring any consultants, accountants, attorneys, or other agents, provide written notice of such hiring and the rate of compensation to defendants and the United States.

F. The Monitoring Trustee shall have no responsibility or obligation for the operation of defendants' businesses.

G. Defendants shall use their best efforts to assist the Monitoring Trustee in monitoring defendants' compliance with their individual obligations under this Final Judgment and under the Hold Separate Stipulation and Order. The Monitoring Trustee and any consultants, accountants, attorneys, and other agents retained by the Monitoring Trustee shall have full and complete access to the personnel, books, records, and facilities relating to compliance with this Final Judgment, subject to reasonable protection for trade secret or other confidential research, development, or commercial information or any applicable privileges. Defendants shall take no action to interfere with or to impede the Monitoring Trustee's accomplishment of its responsibilities.

H. After its appointment, the Monitoring Trustee shall file reports monthly, or more frequently as needed, with the United States, and, as appropriate, the Court setting forth

defendants' efforts to comply with its obligations under this Final Judgment and under the Hold Separate Stipulation and Order. To the extent such reports contain information that the Monitoring Trustee deems confidential, such reports shall not be filed in the public docket of the Court.

I. The Monitoring Trustee shall serve until the divestiture of all the Divestiture Assets is finalized pursuant to either Section IV or Section V of this Final Judgment and the transition services and co-packing agreements with Danone contemplated by Paragraphs IV(G), (H), and (I) have expired or been terminated.

J. If the United States determines that the Monitoring Trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, it may recommend the Court appoint a substitute Monitoring Trustee.

## XI. COMPLIANCE INSPECTION

A. For the purposes of determining or securing compliance with this Final Judgment, or of any related orders such as the Hold Separate Stipulation and Order, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

1. access during defendants' office hours to inspect and copy, or at the option of the United States, to require defendants to provide hard copy or electronic copies of, all books,

ledgers, accounts, records, data, and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendants.

B. Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C. No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(g) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(g) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XII. NO REACQUISITION

Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XIII. RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV. EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

## XV. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: __________________

Court approval subject to procedures
of Antitrust Procedures and Penalties Act,
15 U.S.C. § 16

________________________________
United States District Judge